EXHIBIT **A**

EXHIBIT **A**

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is made as of September 7, 2007, by and among CH2M HILL Companies Ltd., an Oregon corporation ("**CH2M HILL**"), each of the Persons listed on the signature pages hereto (each individually, a "**Seller**" and collectively, "**Sellers**") and VECO Corporation, a Delaware corporation ("**VECO**"). CH2M HILL, Sellers and VECO are sometimes referred to herein as a "**Party**" and collectively as the "**Parties.**"

## RECITALS

WHEREAS, Sellers are the holders of all of the issued and outstanding shares of capital stock of VECO (the "**Shares**"), and each Seller owns the number of Shares set forth opposite such Seller's name on <u>Part 3.3(a)</u> of the Disclosure Letter hereto; and

WHEREAS, Sellers, VECO, and CH2M HILL entered into a certain Letter of Intent dated June 15, 2007 pursuant to which CH2M HILL and Sellers agreed to the transfer of rights, title and interest in the Shares subject to certain terms and conditions (the "**Letter of Intent**"); the Parties are entering into this Agreement to effect their agreements under the Letter of Intent; and

WHEREAS, subject to the terms and conditions set forth herein, each Seller desires to sell, transfer, assign and deliver to CH2M HILL, and CH2M HILL desires to purchase and acquire from each Seller, all of such Seller's respective right, title and interest in and to the Shares (the "**Transaction**").

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## 1. DEFINITIONS

For purposes of this Agreement, certain capitalized terms specified in <u>Exhibit B</u> shall have the meanings specified or referred to in that <u>Exhibit B</u>, except as otherwise expressly provided.

## 2. PURCHASE AND SALE OF SHARES; CLOSING

### 2.1. Purchase and Sale of Shares

Subject to the terms and conditions of this Agreement, at the Closing, each Seller will sell, transfer, assign and deliver to CH2M HILL, and CH2M HILL will purchase and accept from each Seller, all of the Shares, free and clear of all Encumbrances for the consideration set forth in this **Section 2**. On the Closing Date, except as otherwise may be expressly contemplated

by this Agreement, the Acquired Companies will consist of VECO and the Included Subsidiaries, and all of their respective assets, including any interests in joint ventures that are affiliated with the Consolidated Acquired Companies, but will not include any of the Retained Assets to be sold, transferred or otherwise distributed to Sellers or third parties pursuant to the Reorganization.

## 2.2. Closing

The consummation of the Transaction (the **"Closing"**) will take place at the offices of Kirkpatrick & Lockhart Preston Gates Ellis LLP, Suite 2900, 925 4th Ave, Seattle, WA 98104, at 10:00 a.m. (local time) on the first Business Day after all of the conditions precedent to Closing hereunder shall have been satisfied or waived, or at such other time and place as the Parties shall agree upon in writing. Subject to the provisions of **Section 9** *(Termination)*, failure to consummate the Transaction on the date and time and at the place determined pursuant to this **Section 2.2** will not result in the termination of this Agreement and will not relieve any Party of any obligation under this Agreement.

## 2.3. Payment of Total Consideration

The total consideration for the Transaction is Three Hundred Eighty Million, Four Hundred Sixty-Five Thousand Dollars ($380,465,000) (the **"Total Consideration"**), which is comprised of the purchase price of Three Hundred Fifty Million Dollars ($350,000,000) (the **"Purchase Price"**), plus Fifteen Million Dollars ($15,000,000) in CH2M HILL Stock Consideration, as provided in **Section 2.6** *(CH2M HILL Stock Consideration)*, plus CH2M HILL's assumption of Fifteen Million Four Hundred Sixty-Five Thousand Dollars ($15,465,000) of outstanding principal and interest in respect of indebtedness under the VECO Alaska Building Loan. The Purchase Price shall be subject to adjustment as further set forth in this Agreement, including pursuant to the provisions of **Section 5.16** *(Payments to Designated Persons)*.

(a) At the Closing, CH2M HILL shall deliver to Sellers an amount (the **"Closing Payment"**) equal to One Hundred Forty-Five Million Nine Hundred Ninety Thousand Six Hundred Twenty Four Dollars ($145,990,624), which equals the Purchase Price, minus the Seventy Million Dollar ($70,000,000) Holdback Amount pursuant to **Section 2.5** *(Purchase Price Holdback)*, minus the Purchase Price Adjustments referred to in Section 2.3(c) below in the amount of Sixty Four Million Five Hundred Twenty Thousand Dollars ($64,520,000), minus the Closing Indebtedness of the Acquired Companies in the amount of Sixty Nine Million Four Hundred Eighty Nine Thousand Three Hundred Seventy Six Dollars ($69,489,376). CH2M HILL shall remit the Closing Payment by wire transfer in accordance with the wire transfer instructions for such Seller set forth in Schedule 2.7(e).

(b) Two Hundred Fifty Thousand Dollars ($250,000) of the Purchase Price shall be deemed allocated to the non-competition agreement to be provided by the Sellers pursuant to **Section 7.4(b)** *(Additional Documents)*, to be allocated among the Sellers who are providing such non-competition agreements pro rata based on the proportion of the Shares held by each such Seller to the number of Shares held by all such Sellers. The Parties shall, and shall

cause their Affiliates to, make all Tax reporting on Tax Returns in a manner consistent with the foregoing.

(c)     The Parties acknowledge and agree that the Purchase Price was calculated based on extensive negotiations between the Parties pursuant to which the Parties agreed to the adjustments set forth on Schedule 2.3(c) (the **"Purchase Price Adjustments"**), which reflect, among other things, the (i) changes to the business of VECO and its Subsidiaries from March 31, 2007 through the date of the Interim Balance Sheet, after giving effect to the Reorganization, (ii) various accruals, adjustments and assumptions related to the operation of the Acquired Companies for the period from the date of the Interim Balance Sheet through and including the Closing Date, and (iii) the aggregate outstanding principal amount (exclusive of interest) of all outstanding Indebtedness of the Acquired Companies as of July 31, 2007, determined on a consolidated basis without duplication, excluding (y) the outstanding principal amount (exclusive of interest) in respect of indebtedness under the VECO Alaska Building Loan, and (z) the outstanding principal amount of the Defeasance Indebtedness, but not the amount of any undefeased portion thereof (such Indebtedness is referred to collectively, as the **"Closing Indebtedness"**).  The Parties agree that the terms and amounts set forth in the Purchase Price Adjustments were negotiated in good faith and are based on good faith, reasonable estimates and valuations with respect to each item included therein, including the valuations of relevant assets and liabilities, including the valuation of Retained Assets and related Taxes.  The Parties further agree that the valuation set forth in the Retained Asset and Liability Schedule or Schedule 2.3(c), as applicable, will be used for the Tax reporting on Tax Returns for periods ending on or prior to the Closing Date unless otherwise required by the preparer selected by Sellers of the Tax Returns to be prepared and filed pursuant to Section 11.3.

## 2.4.     Post-Closing Adjustments

(a)     Within sixty (60) days following the Closing Date, CH2M HILL shall deliver to Sellers' Representative a statement (in its final and binding form as determined below, the **"Closing Statement"**) calculated as of the end of business in Anchorage, Alaska on the Closing Date (i) setting forth the actual amounts of accounts receivable, whether billed or unbilled, with respect to the Vankor Contract in respect of invoices for work prior to and outstanding as of the Closing Date (**"Vankor Outstanding Balance"**), which has been agreed by Sellers and CH2M HILL as being $29,754,689 as of July 31, 2007, and (ii) the relevant balance sheets of Commonwealth Construction Canada Ltd. and Commonwealth Construction Company Ltd. as of the Closing and the adjustment to cash or credit to cash as between them as of Closing, all in accordance with Section 7.1 of the CCC Transfer Agreement (the **"CCC Adustments"**").  The Closing Statement shall be prepared in sufficient detail to enable the Parties to determine the items set forth on the Closing Statement.  Sellers directly and through the Sellers Representative shall cooperate as reasonably requested in connection with the preparation of the Closing Statement.  The Closing Statement shall become final and binding upon the Parties thirty (30) days following receipt thereof by the Sellers' Representative, unless the Sellers' Representative gives written notice of Sellers' disagreement (a **"Notice of Disagreement"**) to CH2M HILL on or prior to such date.  Any Notice of Disagreement shall specify in reasonable detail the nature, basis and dollar amount of any disagreement so asserted.  If a timely Notice of Disagreement is received by CH2M HILL, then CH2M HILL and Sellers shall seek in good faith to resolve any

3

differences which they may have with respect to the matters specified in the Notice of Disagreement. Such resolution shall be pursued through good faith negotiations between the Sellers' Representative and CH2M HILL. If after diligent efforts of the representatives of the Parties, the disagreement cannot be resolved within thirty (30) days of CH2M HILL's receipt of the Notice of Disagreement, the disagreement shall be resolved as provided in **Section 12.10** (*Dispute Resolution Procedures*) of this Agreement; the Closing Statement and related adjustments shall become final and binding on the Parties, including for purposes of Section 7.1 of the CCC Transfer Agreement, on the date that the dispute is finally settled as provided in **Section 12.10** (*Dispute Resolution Procedures*). For purposes of this Agreement, the final determination date ("**Final Determination Date**") shall mean the later of (i) thirty (30) days following receipt of the Closing Statement by Sellers' Representative, or (ii) if the Closing Statement is disputed by Sellers' Representative, the date the dispute is finally resolved.

(b) The Parties agree that they will negotiate in good faith and utilize good faith, reasonable estimates and valuations with respect to each item included in the Closing Statement.

(c) Any CCC Adjustments made as a result of the provisions of Section 2.4 and Section 7.1 of the CCC Transfer Agreement) shall be paid in accordance with the terms of the CCC Transfer Agreement.

(d) The Parties acknowledge and agree that, for the purposes of U.S. Federal and state income tax purposes only, the Indebtedness under the Veco Alaska Building Loan shall be treated as part of Total Consideration, but shall *not* be treated as part of the Purchase Price or consideration paid to or received by Sellers and the Parties shall, and shall cause their Affiliates to, make all Tax reporting on Tax Returns in a manner consistent with the foregoing.

**2.5. Purchase Price Holdback**

(a) At Closing, CH2M HILL shall retain from the Purchase Price otherwise deliverable pursuant to **Section 2.3** (*Payment of Total Consideration*) an amount of cash equal to Seventy Million Dollars ($70,000,000) (the "**Holdback Amount**") as security for the indemnification and other obligations of Sellers set forth in this Agreement but subject to the provisions of **Section 5.16** (*Payments to Designated Persons*). Interest shall accrue at the Applicable Rate on the balance of the Holdback Amount and will be paid on a quarterly basis in arrears on March 1, June 1, September 1 and December 1 of each year commencing with December 1, 2007 (or, if any such date is not a Business Day, the first Business Day thereafter) for so long as any remaining Holdback Amount is held by CH2M HILL. CH2M HILL shall make such interest payments to Sellers' Representative by wire transfer for remittance to each Seller based on such Seller's Pro Rata Share. Notwithstanding the foregoing, interest shall only be payable on each such interest payment date with respect to that portion of the Holdback Amount that has not been applied on or prior to such interest payment date to the satisfaction of the indemnification and other obligations of Sellers.

(b) On the first anniversary of the Closing Date (or, if such date is not a Business Day, the first Business Day thereafter), subject to **Section 5.16** (*Payments to Designated Persons*), CH2M HILL shall release Thirty Million Dollars ($30,000,000) of the

4

Holdback Amount to Sellers' Representative for remittance to each Seller based on such Seller's Pro Rata Share, less any amounts then in dispute or subject to a contingent claim pursuant to **Section 10.13** (*Contingent Claims*) or previously applied in respect of the indemnification obligations of Sellers and other obligations under this Agreement, including a claim for breach of a non-competition agreement pursuant to **Section 10.2(h)** (but subject to the provisions of **Section 10.9(c)** ); provided, that, with respect to Bill Allen and his Related Persons, CH2M HILL shall not be obligated to release such Sellers' Pro Rata Share of such amount on the first anniversary of the Closing Date if, at such time, such Sellers are not in compliance in all material respects with their obligations under **Section 10.11(b)** (*Indemnification Procedures for a Business Customer Claim; Cooperation*), in which case such amounts shall not be released to such Sellers until the third anniversary of the Closing Date, subject to **Section 2.5(c)**. For purposes of this provision and other relevant provisions, an amount "in dispute" shall mean that CH2M HILL has made a good faith claim with respect to the amount in accordance with the applicable provisions of this Agreement and such amount remains unresolved through settlement of the Parties, extinguishment or abandonment of any applicable third party claim that gave rise to CH2M HILL's claim, or final resolution in accordance with the terms of this Agreement.

(c)     On the third anniversary of the Closing Date, subject to **Section 5.16** (*Payments to Designated Persons*), or, if such date is not a Business Day, the first Business Day thereafter), CH2M HILL shall release the balance of the Holdback Amount to Sellers' Representative for remittance to each Seller based on such Seller's Pro Rata Share, less (i) any amounts then in dispute or subject to a contingent claim pursuant to **Section 10.13** (*Contingent Claims*) or previously applied in respect of the indemnification obligations of Sellers and other obligations under this Agreement, including a claim for breach of a non-competition agreement pursuant to **Section 10.2(h)** (but subject to the provisions of **Section 10.9(c)**), (ii) to the extent provided in **Section 10.5(e)** (*Time Limitations and Estimation of Certain Amounts*), the amount of any estimated Tax indemnity determined in accordance with such Section, and (iii) to the extent provided in **Section 10.5(f)** (*Time Limitations and Estimation of Certain Amounts*), the amount of any estimated HEBL Environmental Exposure and any HEBL End of Lease Exposure.

(d)     Any amounts withheld from Sellers pursuant to **Sections 2.5(b)** or (c) in connection with amounts in dispute or subject to an existing claim (including a contingent claim under **Section 10.13** (*Contingent Claims*)), to the extent not applied in satisfaction of the obligations of Sellers set forth in this Agreement, shall be paid by wire Transfer to Sellers' Representative promptly upon, but in no event more than three (3) Business Days after, resolution of such dispute, together with accrued but unpaid interest thereon to the date of payment at the Applicable Rate for remittance to each Seller based on such Seller's Pro Rata Share.

(e)     All payments by CH2M HILL directly to Sellers under this **Section 2.5** (as opposed to payments to Sellers' Representative for remittance to Sellers) shall be made by CH2M HILL by wire transfer to each Seller in accordance with such Seller's Pro Rata Share, subject in each case to the indemnity and exculpation provisions of **Section 2.7(e)** (*Sellers' Representative; Reliance by CH2M HILL on Sellers' Information*).

5

(f)     The foregoing provisions of this **Section 2.5** and other applicable provisions of this Agreement with respect to Holdback Amounts, shall be subject to further modification pursuant to the provisions of **Section 5.16** (*Payments to Designated Persons*).

## 2.6.    CH2M HILL Stock Consideration

(a)     CH2M HILL shall make appropriate provision for the issuance to the Employees of the Acquired Companies identified on Schedule 2.6(a) of CH2M HILL common stock, par value of $0.01 per share, share equivalents or cash equivalents, having an aggregate value, including the amount of any related Taxes (including withholding tax accruals and remittance obligations), costs and expenses payable by CH2M HILL and Employees of the Acquired Companies in respect thereof of Fifteen Million Dollars ($15,000,000) (collectively, the **"CH2M HILL Stock Consideration"**).

(b)     At Closing, CH2M HILL shall certify to the Sellers' Representative that CH2M HILL has taken all steps reasonably necessary to arrange for the issuance reasonably promptly after the Closing Date of the total number of shares of CH2M HILL common stock and cash equivalents. With respect to CH2M HILL shares and stock equivalents, they shall be issued in the name of and allocated among the Employees of the Acquired Companies in the manner and amounts specified in Schedule 2.6(a).

(c)     The total number of shares of CH2M HILL common stock and stock equivalents to be issued shall be determined by reference to the price per share set forth in CH2M HILL's most recent (at the time of share issuance) Periodic Report on Form 8-K filed by CH2M HILL with the U.S. Securities and Exchange Commission. The Parties acknowledge and agree that, for the purposes of U.S. Federal and state income tax purposes only, the CH2M HILL Stock Consideration shall be treated as part of Total Consideration, but shall *not* be treated as part of the Purchase Price or consideration paid to or received by Sellers and the Parties shall, and shall cause their Affiliates to, make all Tax reporting on Tax Returns in a manner consistent with the foregoing.

## 2.7.    Sellers' Representative; Reliance by CH2M HILL on Sellers' Information

(a)     VC Sellers Reserve, LLC, a Washington limited liability company, whose general manager is William M. Barstow, shall be the Sellers' representative (the **"Sellers' Representative"**) and, as such, shall serve as and have all powers as agent and attorney-in-fact of each Seller, for and on behalf of each Seller only from and after Closing (except as otherwise expressly provided for in this Agreement): (i) to give and receive notices and communications; (ii) to have authority to agree to, negotiate, enter into settlements and compromises of, and demand mediation and arbitration and comply with orders of courts and awards of arbitrators with respect to any disputes related to the indemnification provisions of **Section 10** (*Indemnification; Remedies*); (iii) to litigate, mediate, arbitrate, defend, enforce or to take any other actions and execute any other documents that the Sellers' Representative deems advisable in connection with enforcing any rights or obligations or defending any claim or action under this Agreement on behalf of Sellers; (iv) to extend or otherwise reschedule the Closing Date; (v) to undertake such actions on behalf of Sellers as specifically require action of Sellers pursuant to

(ii)     to Sellers' Representative, a certificate, dated as of the Closing Date, executed by an authorized officer of CH2M HILL as to the accuracy of the representations and warranties of CH2M HILL as of the date of this Agreement and as to its compliance with and performance of their covenants and obligations to be performed or complied with at or before the Closing in accordance with **Section 8.2** (*CH2M HILL's Performance)*;

(iii)     to Sellers' Representative a certificate, dated as of the Closing Date, of the Secretary or an Assistant Secretary of CH2M HILL certifying, among other things, that attached or appended to such certificate: (A) is a true and correct copy of its Bylaws, and all amendments thereto; (B) is a true copy of all corporate actions taken by it, regarding resolutions of its board of directors, authorizing, to the extent required of CH2M HILL, the consummation of the Transaction and the execution, delivery and performance of this Agreement and the other Transaction Documents to be delivered by it pursuant hereto; and (C) are the names and signatures of its duly elected or appointed officers who are authorized to execute and deliver this Agreement and the other Transaction Documents to which it is a party;

(iv)     to Sellers' Representative copies of the Consents identified in Schedule 4.2;

(v)     to Sellers' Representative a certificate, dated as of the Closing Date, executed by the Secretary or an Assistant Secretary of CH2M HILL certifying that CH2M HILL has made all the necessary provisions to issue the CH2M HILL Stock Consideration in accordance with **Section 2.6** (*CH2M HILL Stock Consideration)* of this Agreement;

(vi)     to Sellers' Representative a copy of the Norcon Property Lease Agreement duly executed by CH2M HILL on behalf of Norcon, Inc.;

(vii)     the opinion of Margaret McLean, General Counsel of CH2M HILL and of Morrison & Foerster LLP, counsel to CH2M HILL, in the form of Exhibit F and Exhibit G; and

(viii)     a copy of the Transition Services Agreement duly executed by VECO and VECO Canada, Ltd..

## 3.     REPRESENTATIONS AND WARRANTIES OF VECO AND SELLERS

Subject to **Section 12.18** (*Joint Ventures)* and except as set forth herein and in the Disclosure Letter, (a) VECO represents and warrants to CH2M HILL that the statements contained in this **Section 3** are true and correct, and (b) each of the Sellers represents and warrants that the statements in **Sections 3.2** (*Authority; No Conflict)*, **3.3(a)** (*Capitalization)*, **3.25** (*Disclosure)*, **3.27** (*Brokers or Finders)* and **3.31** (*Payments Among Shareholders in Connection with the Transaction),* to the extent such statements contained in such Sections are made expressly with respect to Sellers, are true and correct, in each case subject to the limitations of **Section 10.9(a)** (*Exclusive Remedy; Manner of Payment; Allocation of Certain Indemnification Obligations)*, as follows:

10

(c)     With respect to personal properties and assets that are leased (the "**Leased Personal Property**"), the Acquired Companies have a valid leasehold interest in such Leased Personal Property and all such leases are in full force and effect and, to VECO's Knowledge, constitute valid and binding obligations of the other party(ies) thereto. None of the Acquired Companies, or to VECO's Knowledge, any other party thereto, is in breach of any of the terms of any such lease, except where any such violation would not be material to the Acquired Companies taken as a whole.

(d)     Other than the Acquired Companies, holders of Permitted Encumbrances (solely to the extent of such Permitted Encumbrances) and lessors of Leased Personal Property (solely to the extent of their interest in such Leased Personal Property), no Person has any interest in any equipment or other tangible assets or properties (other than Real Property) used by the Acquired Companies. Without limiting the foregoing, none of the Subsidiaries of VECO (other than the Acquired Companies) has any interest in any equipment or other tangible assets or properties (other than Real Property) used in the businesses of the Acquired Companies. Nothing in the foregoing is intended to constitute a representation and warranty as to infringement or misappropriation of third party Intellectual Property Rights.

### 3.7.    Real Property

(a)     Part 3.7(a) of the Disclosure Letter contains (i) a list of all real property and interests in real property owned in fee by the Acquired Companies (together with any buildings and other improvements thereon, the "**Owned Real Property**"), (ii) a list of all real property and interests in real property leased by the Acquired Companies (the "**Leased Real Property**" and together with the Owned Real Property, the "**Real Property**") and (iii) a list of all agreements, contracts, commitments or options respecting the purchase or lease of any interest in real property by the Acquired Companies. The Real Property listed on the Disclosure Letter includes all interests in real property used in or necessary for the conduct of the businesses and operations of the Acquired Companies as currently conducted.

(b)     With respect to each parcel of Owned Real Property:

(i)     The Acquired Companies have good and marketable title to each such parcel of Owned Real Property free and clear of all Encumbrances, except (A) Permitted Encumbrances and (B) zoning and building restrictions, easements, covenants, rights-of-way and other similar restrictions of record, none of which materially impairs the current use of such Owned Real Property.

(ii)     The legal description for such parcel of Owned Real Property contained in the deed thereof described the property fully and accurately. All buildings, structures and facilities located on, and improvements to, such parcel of Owned Real Property are located within the boundary lines of such Owned Real Property and do not encroach on any easement, right-of-way or other encumbrance which burdens any portion of the Owned Real Property. No structures, facilities or other improvements on any parcel adjacent to the Owned Real Property encroach onto any portion of the Owned Real Property. All of the buildings, plants and structures that are located on or are being constructed by the Acquired Companies on the Owned Real Property have been constructed in accordance with Legal Requirements.

15

(iii)    VECO has Provided to CH2M HILL copies of the deeds and other instruments (as recorded) by which the Acquired Companies acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of the Acquired Companies relating thereto.

(iv)    Subject to the transfers of real property contemplated by the Reorganization, there are no outstanding options or rights of first refusal or other arrangements to purchase such parcel of Owned Real Property, or any portion thereof or interest therein.

(c)    With respect to the Leased Real Property, VECO has Provided to CH2M HILL a true and complete copy of every lease and sublease pursuant to which the Consolidated Acquired Companies are a party or by which they are bound (each, a **"Lease"**). The Acquired Companies have peaceful and undisturbed possession of the Leased Real Property in accordance with the terms of the applicable Lease. To VECO's Knowledge, each Lease is in good standing, creates good and valid rights of use and occupancy in the leased Real Properties, has been properly registered or recorded (if applicable), has all required Governmental Authorizations and is in full force and effect without amendment or other modification.

(d)    The zoning restrictions on the buildings, facilities and other improvements located on the Owned Real Property do not materially restrict or impair the use of the Owned Real Property for purposes of the businesses of the Acquired Companies as currently conducted. To VECO's Knowledge, the zoning restrictions on the buildings, facilities and other improvements located on the Leased Real Property do not materially restrict or impair the use of the Leased Real Property for purposes of the businesses of the Acquired Companies as currently conducted.

(e)    No Governmental Body having the power of eminent domain over the Real Property has commenced or, to VECO's Knowledge, Threatened or taken publicly disclosed steps to exercise the power of eminent domain or a similar power with respect to all or any part of the Owned Real Property or, to VECO's Knowledge, with respect to all or any part of the Leased Real Property. There are no pending or, to VECO's Knowledge, Threatened condemnation, fire, health, safety, building, zoning or other land use regulatory proceedings, lawsuits or administrative actions relating to any portion of the Real Property or any other matters which do or may adversely affect the current use, occupancy or value thereof. None of the Acquired Companies has received written notice of any pending or Threatened special assessment proceedings affecting any portion of the Real Property.

(f)    The Owned Real Property and all present uses and operations of the Owned Real Property comply in all material respects with all Legal Requirements, covenants, conditions, restrictions, easements, disposition agreements and similar matters affecting the Owned Real Property. The Owned Real Property and its continued use, occupancy and operation as used, occupied and operated in the conduct of the businesses of the Acquired Companies do not constitute a nonconforming use and is not the subject of any special use permit under any Legal Requirement. To VECO's Knowledge, the Leased Real Property and all present uses and operations of the Leased Real Property comply in all material respects with all Legal Requirements, covenants, conditions, restrictions, easements, disposition agreements and similar matters affecting the Leased Real Property. To VECO's Knowledge, the Leased Real

16

Property and its continued use, occupancy and operation as used, occupied and operated in the conduct of the businesses of the Acquired Companies do not constitute a nonconforming use and is not the subject of any special use permit under any Legal Requirement.

(g)     The Real Property is in a suitable condition for the Acquired Companies' business as currently conducted, subject to ordinary wear and tear and to necessary maintenance and capital expenditures as contemplated by the maintenance and capital expenditure budgets of the Acquired Companies as prepared in the Ordinary Course of Business. Each of the Acquired Companies has good and valid rights of ingress and egress to and from all Owned Real Property and Leased Real Property where the Acquired Company is the primary tenant, and to VECO's Knowledge, all other Leased Real Property. With respect to such Real Property located in urban or semi-urban areas, such rights of ingress and egress are from and to the public street systems for all usual street, road and utility purposes.

(h)     No Person other than the Acquired Companies is in possession of any of the Owned Real Property or any portion thereof, and the Acquired Companies have not granted, and, to VECO's Knowledge, no other Person has granted, any lease, sublease, license, concession or other agreement, written or oral, to any Person (other than the Acquired Companies) that provides for the right of use or occupancy of the Real Property or any portion thereof. No easement, utility transmission line or water main located on the Owned Real Property or, to VECO's Knowledge, on the Leased Real Property, adversely affects the use of the Real Property or any improvement on the Real Property in any material respect.

(i)     All water, sewer, gas, electric, telephone and drainage facilities, and all other utilities required by any Legal Requirement, or by the use and operation of the Owned Real Property in the conduct of the businesses of the Acquired Companies are, installed to the property lines of the Owned Real Property, are where applicable connected pursuant to valid permits to municipal or public utility services or proper drainage facilities, are (subject to ordinary wear and tear and to maintenance and capital expenditures in accordance with the maintenance and capital expenditure budgets of the Acquired Companies as prepared in the Ordinary Course of Business), operable and adequate as necessary to service the Owned Real Property in the operation of the businesses of the Acquired Companies and to permit compliance with the requirements of all material Legal Requirements in the operation thereof. No fact or condition exists that could result in the termination or material reduction of the current access from the Owned Real Property to existing roads or to sewer or other utility services presently serving the Owned Real Property that is in the reasonable control of the Acquired Companies or, to VECO's Knowledge, is in the control of another Person.

(j)     With respect to the Leased Real Property in which an Acquired Company is the primary tenant (and with respect to all other Leased Property to VECO's Knowledge), all water, sewer, gas, electric, telephone and drainage facilities, and all other utilities required by any Legal Requirement, or by the use and operation of the Leased Real Property in the conduct of the businesses of the Acquired Companies are, installed to the property lines of the Leased Real Property, are where applicable, connected pursuant to valid permits to municipal or public utility services or proper drainage facilities, are (subject to ordinary wear and tear and to maintenance and capital expenditures in accordance with the maintenance and capital expenditure budgets of the Acquired Companies as prepared in the Ordinary Course of

Business), operable and adequate as necessary to service the Leased Real Property in the operation of the businesses of the Acquired Companies and to permit compliance with the requirements of all material Legal Requirements in the operation thereof. No fact or condition exists that could result in the termination or material reduction of the current access from the Leased Real Property to existing roads or to sewer or other utility services presently serving the Leased Real Property that is in the reasonable control of the Acquired Companies or, to VECO's Knowledge, is in the control of another Person.

### 3.8. Condition and Sufficiency of Assets

The buildings, plants, structures, and equipment of the Acquired Companies (except to the extent such assets are set aside for spare parts or abandoned and, in either case, not carried on the Balance Sheet or the Interim Balance Sheet or the relevant Joint Venture balance sheet provided to CH2M HILL, at a value in excess of reasonably estimated salvage value) are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs subject to ordinary wear and tear and to maintenance and capital expenditures as contemplated by the maintenance and capital expenditure budgets of the Acquired Companies as prepared in the Ordinary Course of Business. The building, plants, structures, and equipment of the Acquired Companies are sufficient for the continued conduct of the Acquired Companies' businesses after the Closing in substantially the same manner as conducted prior to the Closing, subject to the exceptions set forth in the prior sentence.

### 3.9. Accounts Receivable

All accounts receivable, whether billed or unbilled, of the Consolidated Acquired Companies that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Consolidated Acquired Companies as of the Closing Date (such accounts receivable, whether billed or unbilled, collectively, the **"Accounts Receivable"**) represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business and such Accounts Receivable have not been and will not be assigned (except with respect to Permitted Encumbrances for Closing Indebtedness), transferred, sold, factored or discounted. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Consolidated Acquired Companies as of the Closing Date (which reserves are adequate and calculated consistent with past practice). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within one year after the Closing Date, provided that foregoing does not apply to Accounts Receivable in respect of the Vankor Contract. There is no written, or to VECO's Knowledge, Threatened, contest, claim, or right of set-off, other than returns or requests for rework in the Ordinary Course of Business, under any Applicable Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. The schedule of Accounts Receivable dated August 24, 2007 provided by VECO to CH2M HILL contained a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth for billed Accounts Receivable the aging of such Accounts Receivable.

18

(i)     the terms of such Employee Benefit Plan; and

(ii)    Legal Requirements.

(f)     Except as disclosed on, reflected in or provided for in the Balance Sheet or Interim Balance Sheet or on the accounting records of the Acquired Companies as of the Closing Date (which recording is adequate and consistent with past practice), VECO and each other Acquired Company, as applicable, has fully funded to date and otherwise fulfilled or taken all actions necessary to enable it to fulfill when due all obligations under each of its Employee Benefit Plans that arise or accrue on or before the Closing Date; there is no existing material default or event of default or any event which, with or without the giving of notice or the passage of time, would constitute a default under any such Employee Benefit Plans that arise or accrue on or before the Closing Date; no notice of under-funding or other default has been received by VECO or any Subsidiary in respect of any such Employee Benefit Plans; and there are currently no Proceedings relating to or involving any such Employee Benefit Plans in respect of which service has been effected on VECO or any Subsidiary, and, to the Knowledge of VECO, no such Proceedings have been commenced and there are no grounds and there is no basis upon which any such Proceedings might be commenced against VECO or any Subsidiary.

### 3.15.    Compliance With Legal Requirements; Governmental Authorizations

(a)     (i)    Each Acquired Company is, and at all times since March 31, 2002, has been, in compliance with all material Legal Requirements that are or were applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets.

(ii)    No event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by any Acquired Company of, or a failure on the part of any Acquired Company to comply with, any material Legal Requirement, or (B) may give rise to any obligation on the part of any Acquired Company to undertake, or to bear all or any portion of the cost of, any Remedial Action of any material nature.

(iii)   No Acquired Company has received, at any time since March 31, 2004, any written notice or other written communication or, to VECO's Knowledge, any other notice or communication, from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any material Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of any Acquired Company to undertake, or to bear all or any portion of the cost of, any Remedial Action of any material nature.

(iv)    None of the Russian Subsidiaries has been notified that it is subject to any investigation by FAS or any predecessor Governmental Body.  VECO has not received notice that any agreement, practice or arrangement carried on by any of the Russian Subsidiaries to which any of them is or has been a party infringes any Legal Requirements related to competition, restrictive trade practice, antitrust and fair trading and, to VECO's Knowledge, no such infringement is occurring.

(b)     Part 3.15(b) of the Disclosure Letter contains a complete and accurate list of each material Governmental Authorization that is held by any Acquired Company or that otherwise relates to the business of, or to any of the assets owned or used by, any Acquired Company, in each case which are material to the conduct of the business of the Acquired Companies. Each Governmental Authorization listed or required to be listed in Part 3.15(b) of the Disclosure Letter has been duly obtained and is valid and in full force and effect and there are no payments outstanding from any of the Acquired Companies in respect of such Governmental Authorizations. Except as set forth in Part 3.15(b) of the Disclosure Letter:

(i)     each Acquired Company is, and at all times since March 31, 2002, has been, in compliance in all material respects with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.15(b) of the Disclosure Letter;

(ii)     no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.15(b) of the Disclosure Letter, or (B) result in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.15(b) of the Disclosure Letter;

(iii)     no Acquired Company has received, at any time since March 31, 2004, any written notice or other written communication or, to VECO's Knowledge, any other notice or communication, from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization;

(iv)     all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.15(b) of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies; and

(v)     all reports, returns and information required by any Legal Requirements or as a condition of any Governmental Authorization to be made or given to any Person or Governmental Body have been made or given to the appropriate Person or Governmental Body.

### 3.16.  Legal Proceedings; Orders

(a)     As of the date of this Agreement, there is no pending Proceeding that has been commenced or, to VECO's Knowledge, Threatened by or against any Acquired Company or that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, the Transaction. To VECO's Knowledge, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the

(iii)     The Acquired Companies have paid all premiums due, and have otherwise performed all of their respective obligations, under each policy which have been directly contracted for by VECO and as to which any Acquired Company is a party to or which provides coverage to any Acquired Company or director or officer thereof.

(iv)     Since March 31, 2004 the Acquired Companies have given notice to the insurer of all claims that may be insured thereby.

### 3.20.  Environmental Matters

Except as set forth in Part 3.20 of the Disclosure Letter:

(a)     Each Acquired Company is, and at all relevant times has been, in material compliance with, and has not been and is not in violation of or liable under, any Environmental Law.  No Acquired Company has received any actual or Threatened written order, notice, or other written communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which any Acquired Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, treated, stored, disposed, used, or processed by any Acquired Company, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received by any Acquired Company.

(b)     There are no pending or, to VECO's Knowledge, Threatened claims, Encumbrances, or other similar restrictions, resulting from any Environmental, Health and Safety Liabilities or arising under or pursuant to Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which any Acquired Company has or had an interest and, to VECO's Knowledge, no action of any Governmental Body has been taken or is in the process that could subject any of such Facilities to such Encumbrances.

(c)     None of the Acquired Companies nor, to VECO's Knowledge, any other Person for whose conduct the Acquired Companies are or may be held responsible, has received, at any time since March 31, 2002, any written citation, directive, inquiry, notice, Order, summons, warning, or other written, electronic or, to VECO's Knowledge, oral communication relating to (i) any Environmental, Health, Safety Liabilities, Hazardous Activity, or Hazardous Materials, (ii) any alleged, actual, or potential violation or failure to comply with any Environmental Law, or (iii) any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which any Acquired Company has or had an interest, or with respect to any property or Facility at which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by any Acquired Company.

dn-137911 v7

(d) No Acquired Company nor, to VECO's Knowledge, any other Person for whose conduct the Acquired Company is or may be held responsible, has any Environmental, Health and Safety Liabilities with respect to the Facilities or with respect to any other properties or assets (whether real, personal, or mixed) in which any Acquired Company has or had an interest, or with respect to any property or assets (whether real, personal, or mixed) geographically, geologically or hydrologically connected to the Facilities or any such other property or assets.

(e) There are no Hazardous Materials present on or in the Environment at the Facilities or at any geographically, geologically or hydrologically connected property in a manner that has or could give rise to any Environmental, Health, and Safety Liabilities to the Acquired Companies, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such connected property, or incorporated into any structure therein or thereon not in compliance with Environmental Law. To VECO's Knowledge, none of the following exists at any of the Real Property: any asbestos-containing material in any form which is friable; urea formaldehyde foam insulation; polychlorinated biphenyls in any concentration; active or out-of-service or underground storage tanks or sites from which such storage tanks have been removed; landfills, solid waste management units, surface impoundments, waste piles or land disposal areas as defined in Environmental Law. No Acquired Company, or to VECO's Knowledge, any other Person, has permitted or conducted, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which any Acquired Company has or had an interest, except, in each case, in material compliance with applicable Environmental Laws.

(f) There has been no Release or, to VECO's Knowledge, Threat of Release of any Hazardous Materials in such manner as have given or would give rise to any Environmental, Health, and Safety Liabilities at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, treated, stored, disposed, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which any Acquired Company has or had an interest, or any geographically, geologically or hydrologically connected property, in each case, whether by any Acquired Company or any other Person.

(g) VECO has delivered or made available to CH2M HILL true and complete copies and results of any reports, studies, analyses, tests, monitoring or other similar documents that are possessed or initiated by any Acquired Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by any Acquired Company with Environmental Laws.

### 3.21. Employees

(a) VECO has Provided to CH2M HILL a complete and accurate list of the following information for each Employee, officer and director of the Acquired Companies, including each Employee on leave of absence or layoff status: employer; name; job title; current compensation (in the case of the Joint Ventures, such information was limited to the names of

39

purposes of determining materiality in this Section that the transactions contemplated by this Agreement shall have been effected) and CH2M HILL shall have the option of terminating this Agreement any time after such request is formally made by any Governmental Body. In the event any Governmental Body or third party initiates any legal action or other proceeding seeking (1) to enjoin all or any material portion of the Transaction, (2) relief that would prevent the Parties from consummating any material portion of the Transaction or (3) relief that would have any material impact on the terms of this Agreement, and such legal action does not arise as a result of any breach by CH2M HILL of its representations, warranties and covenants as contained in this Agreement, or any other wrongful act or omission of CH2M HILL, CH2M HILL shall not be required to litigate or defend any such action or proceeding and CH2M HILL shall have the option of terminating this Agreement at any time after such action or proceeding is initiated.

### 6.2. Notification

Between the date of this Agreement and the Closing Date, CH2M HILL will promptly notify VECO in writing if CH2M HILL becomes aware of any fact or condition that causes or constitutes a breach of any of CH2M HILL's representations and warranties in this Agreement. During the same period, CH2M HILL will promptly notify VECO of the occurrence of any breach of any covenant of CH2M HILL in this **Section 6** or of the occurrence of any event that may make the satisfaction of the conditions in **Section 8** (*Conditions Precedent to Sellers' Obligation to Close*) impossible or unlikely.

### 6.3. Best Efforts

Between the date of this Agreement and the Closing Date, CH2M HILL shall use Best Efforts to take all actions and do all things necessary, proper or advisable in order to consummate and make effective the Transaction (including satisfaction, but not waiver, of the conditions set forth in **Section 8** (*Conditions Precedent to Sellers' Obligation to Close*)); provided, however, that CH2M HILL's obligations hereunder will not require CH2M HILL to dispose of or make any change in any portion of its business or to incur any other burden in order to consummate the Transaction. Without limiting the foregoing, CH2M HILL shall execute and deliver all Transaction Documents required to be delivered by or on behalf of CH2M HILL under **Section 8** (*Conditions Precedent to Sellers' Obligation to Close*).

### 6.4. Accounts Receivable

(a)  **Vankor.**

(i)  Until the first anniversary of the Closing Date, but not thereafter, CH2M HILL shall cause VECO and the other Acquired Companies to use their Best Efforts to collect the Vankor Outstanding Balance. Any amounts actually received by VECO or any of its Affiliates after the Closing Date up to the third anniversary of the Closing Date, but not thereafter, in respect of invoices included in the Vankor Outstanding Balance shall be paid (net of out-of-pocket expenses incurred by CH2M HILL in collecting such receivable, including negotiations with Vankor relating to the repayment or satisfaction thereof, net of any

dn-137911 v7

unreimbursed Loss or liability incurred by CH2M HILL or any of it Affiliates in respect of claims arising in connection with performance of the Vankor Contract prior to the Closing Date and net of all applicable Taxes (to the extent not accrued on the books of the Consolidated Acquired Companies as of the Closing Date), but without deduction for any payments accrued or paid prior to the Closing Date in respect of amounts due to subcontractors for work performed prior to the Closing Date on the Vankor Contract. If such payments are received, CH2M HILL will remit them not less frequently than each calendar quarter to Sellers' Representative for distribution to Sellers in accordance with their Pro Rata Shares. If Proceedings have been initiated prior to the third anniversary of the Closing Date to collect the Vankor Outstanding Balance, the period for remittance of such amounts shall be extended until final resolution, without appeal or right of further appeal, of such Proceedings, plus a reasonable period to collect on any judgment in such Proceedings. To the extent that RosNeft or its applicable affiliate has indicated in connection with any such payment whether such payment should be credited in respect of invoices prior to the Closing Date or after the Closing Date, such indication shall determine whether such payment is payable to Sellers or retained by CH2M HILL. In the exercise of its Best Efforts to collect such amount, CH2M HILL shall not and shall cause VECO and its Affiliates not to attempt to influence RosNeft or its Affiliate to attribute any payment to a specific invoice. Notwithstanding the foregoing, CH2M HILL shall have no obligation to institute Proceedings for the collection of such amounts.

(ii)     CH2M HILL shall keep Sellers' Representative reasonably informed about the status of amounts due with respect to the Vankor Contract for work prior to the Closing Date. In connection with any negotiations with RosNeft or its applicable affiliate regarding the payment of, or any dispute in respect of, such accounts receivable, CH2M HILL shall afford a representative of Sellers acceptable to CH2M HILL reasonable opportunity to attend and participate in such negotiations; provided, however, that CH2M HILL reserves the right in its sole discretion to restructure the relationship with RosNeft or such affiliate to comply with applicable Legal Requirements and prudent business practices in the region. The Parties understand and agree that, in connection with such restructuring, CH2M HILL may settle or renegotiate outstanding accounts receivable balances, whether billed or unbilled, under the Vankor Contract, including the Vankor Outstanding Balance; provided that any such settlement or renegotiation will be addressed as a Business Customer Claim in accordance with **Section 10.11(a)**, and to the extent that CH2M HILL has complied with the requirements of such Section in connection with such settlement or renegotiation, CH2M HILL shall have no liability to Sellers with respect to any resulting changes to the Vankor Outstanding Balance.

(iii)     Sellers, VECO and CH2M HILL agree that, from and after the Closing Date, Sellers, acting through Sellers' Representative, shall have the right to pursue recovery for insurance proceeds under the Performance Security Insurance Policy relating to the prepayment of fees under the Vankor Contract and under the Contract Frustration Insurance Policy relating to the Vankor Contract in connection with the Vankor Outstanding Balance. Sellers shall be solely responsible for taking any and all actions in connection with pursuing such claims and shall be responsible for any and all costs and expenses in connection therewith from and after Closing, whether incurred by Sellers or the Acquired Companies. Upon Sellers' reasonable request, acting through Sellers' Representative and without any obligation to incur any expense or obligation, the Acquired Companies may elect, in their reasonable discretion to provide reasonable cooperation in connection with Sellers' pursuit of such claim, at Sellers'

65

expense. Any amounts actually received by an Acquired Company in connection with such insurance shall be promptly paid to Sellers' Representative, for remittance to each Seller based on such Sellers' Pro Rata Share, net of any Tax attributable to the receipt of such amount by the Acquired Companies to the extent not accrued on the books of the Consolidated Acquired Companies as of the Closing Date and less any unreimbursed expenses (including all costs, liabilities, fees and other expenses, including reasonable attorneys' fees) incurred by CH2M HILL or any of its Affiliates in connection with such matter.

(iv)    If, prior to the third anniversary of the Closing Date, all or any portion of the accounts receivable, whether billed or unbilled, comprising the Vankor Outstanding Balance are written off for Tax purposes and as a result CH2M HILL or the Acquired Companies realize a Tax benefit, CH2M HILL shall pay to Sellers' Representative an amount equal to the actual Tax benefit realized, net of expenses related to determining the amount of such Tax benefit and any efforts to collect the Vankor Outstanding Balance. Such payment will be made at the time the statute of limitations expires for the Tax period that the write-down is deducted (or if there is no statute of limitations, three (3) years from the time the Tax Return is filed that contains any such deductible) and the Tax benefit is realized.

(v)    If, CH2M HILL or the Acquired Companies realize any refund of value added Tax paid in the Russian Federation in respect of the Vankor Outstanding Balance CH2M HILL shall pay to Sellers' Representative an amount equal to the actual value added Tax refund received, net of any Tax attributable to the receipt of such amount by the Acquired Companies to the extent not accrued on the books of the Consolidated Acquired Companies as of the Closing Date and less any unreimbursed expenses (including all costs, liabilities, fees and other expenses, including reason. able attorneys' fees) incurred by CH2M HILL or any of its Affiliates in connection with such matter. Such payment will be made reasonably promptly after receipt of such refund.

(vi)    Notwithstanding the foregoing provisions of this Section 6.4(a), (A) CH2M HILL reserves the absolute right to cause VECO and its Affiliates to curtail or cease work in respect of the Vankor Contract if RosNeft or its applicable affiliate continues not to honor its obligations thereunder and (B) CH2M HILL shall have no obligation to expend any effort or expense pursuing any refund of value added Tax or similar Tax paid in the Russian Federation in respect of the Vankor Outstanding Balance. If CH2M HILL or its Affiliates elect to cease work on the Vankor Contract and CH2M HILL has not collected the full Vankor Outstanding Balance within a reasonable time thereafter, then, in lieu of payment of any Tax benefit under clause (iv) above, CH2M HILL or such Affiliate shall take reasonable steps at Sellers' sole cost and expense to assign the unpaid Vankor Outstanding Balance to Sellers' Representative for the benefit of Sellers.

(vii)    The provisions of this **Section 6.4(a)** are subject to the further provisions of **Section 5.16.**

(b)    **Other Closing Date Accounts Receivable.**  Until the first anniversary of the Closing Date, but not thereafter, CH2M HILL shall cause VECO and the other Acquired Companies to use their Best Efforts to collect the amount of all outstanding accounts receivable, whether billed or unbilled, that are reflected on the accounting records of the Consolidated

66

with a copy to:

K&L Gates
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
Attention: Stephan H. Coonrod, Kimberly W. Osenbaugh and Margaret C. Inouye
Facsimile No.:+1 (206) 370-6037
Email Address: stephan.coonrod@klgates.com
kimberly.osenbaugh@klgates.com and margaret.inouye@klgates.com

Post-Closing:
c/o CH2M HILL
9191 South Jamaica Street
Englewood, Colorado 80112
Attention: M. Catherine Santee and Margaret B. McLean
Facsimile No.: +1(720) 286-9250 and +1(720) 286-9103
Email Address: margaret.mclean@ch2m.com and catherine.santee@ch2m.com

CH2M HILL:

CH2M HILL Companies Ltd.
9191 South Jamaica Street
Englewood, Colorado 80112
Attention: M. Catherine Santee and Margaret B. McLean
Facsimile No.: +1(720) 286-9250 and +1(720) 286-9103
Email Address: margaret.mclean@ch2m.com and catherine.santee@ch2m.com

with a copy to:

Morrison & Foerster LLP
370 17th Street, Suite 5200
Denver, Colorado 80202
Attention: Whitney Holmes, Esq.
Facsimile No.: (303) 592-1510
Email Address: wholmes@mofo.com

## 12.5.  Jurisdiction; Service of Process

Except as otherwise provided in **Section 12.10** (*Dispute Resolution Procedures*)
or **Section 10.10(g)** (*Procedure for Indemnification—Third Party Claims*), any action or
Proceeding seeking to enforce any provision of, or based on any right arising out of, this
Agreement shall be brought against any of the Parties in the courts of the State of Washington,
King County or, if it has or can acquire jurisdiction, in the United States District Court for the
Western District of Washington, and each of the Parties consents to the jurisdiction of such
courts (and of the appropriate appellate courts) in any such action or proceeding and waives any
objection to venue laid therein. Process in any action or proceeding referred to in the preceding

96

sentence may be served on any Party anywhere in the world. Each of the Parties hereby irrevocably agrees that a final judgment of any of the courts specified above in any action or proceeding relating to this Agreement or to any of the other documents referred to herein or therein shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

## 12.6.   Further Assurances

The Parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as any of the other Parties may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement, including in respect of the Reorganization and the Retained Asset and Liability Schedule. In that connection, but without limiting the foregoing, to the extent RetainCo or their Affiliates receive any payment that properly belongs to VECO or the other Acquired Companies or VECO or the other Acquired Companies receive payments in respect of the Retained Assets, the parties shall cause such payments to be promptly remitted to the appropriate party.

## 12.7.   Waiver

The rights and remedies of the Parties to this Agreement are cumulative and not alternative only when specifically provided for in this Agreement. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

## 12.8.   Entire Agreement and Modification

This Agreement supersedes all prior agreements between the Parties with respect to its subject matter (including the Letter of Intent, except as provided for below) and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. Notwithstanding the foregoing, this Agreement does not supersede the Confidentiality Agreement, Sections 5(h) and (j) of the Letter of Intent, or paragraph 8 of the letter of intent of May 15, 2007 between the Parties or their Affiliates. This Agreement may not be amended except by a written agreement executed by the Party to be charged with the amendment.

# CERTAIN DEFINITIONS

**"Acquired Companies"** means VECO and the Included Subsidiaries, collectively.

**"Advance Ruling Certificate"** means a certificate issued by the Commissioner under Section 102 of the *Competition Act*.

**"Affiliates"** means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.

**"Applicable Contract"** means any Contract other than a Contract that is part of the Retained Assets (a) under which any Acquired Company has or may acquire any rights, (b) under which any Acquired Company has or may become subject to any obligation or liability, or (c) by which any Acquired Company or any of the assets owned or used by it is or may become bound.

**"Applicable Rate"** means, as of any date of determination, a per annum rate of interest equal to the sum of (x) 1.25% per annum, plus (y) the "Libor Rate" then in effect for "Libor Loans" having an "Interest Period" of one month, as set forth in *The Wall Street Journal*; provided however, that any payment due to be paid by any Party and not the subject of a good faith dispute between the Parties shall bear interest from the date such payment is due until the date of payment and receipt by the payee at a default rate equal to the sum of the Applicable Rate in effect at the time such payment first became due plus 4% per annum. Any payment that is the subject of a good faith dispute among the Parties shall not bear interest at the default rate unless and until such amount remains unpaid for three Business Days after the date such dispute is finally resolved. For purposes of interest accruing with respect to the Holdback Amount, such interest shall accrue from the Closing Date until February 1, 2008 at the Applicable Rate in effect on the Closing Date and thereafter shall be determined on each September 1 and February 1 until the full amount of the Holdback Amount is paid to Sellers or applied in respect of indemnification obligations of Sellers under this Agreement.

**"Best Efforts"** means the efforts that a commercially prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as reasonably possible; provided, however, that an obligation to use Best Efforts under this Agreement does not require the Person subject to that obligation to take actions that would result in a materially adverse change in the benefits to such Person from this Agreement and the Transaction or in any other material adverse changes to such Person.

**"Business Day"** means any day on which banks are not required or authorized to close in Denver, Colorado or Anchorage, Alaska.

**"CCC Transfer Agreement"** means that certain Asset Transfer Agreement entered into in connection with the consummation of the Transaction, between Commonwealth Construction Canada Ltd., a British Columbia company, and Commonwealth Construction Company Ltd., a British Columbia company.

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

VECO

**VECO CORPORATION**, a Delaware corporation

By: _____

Name: _____Daniel E. Armel_____

Title: _____Interim CEO_____

Sellers

**Allen Limited Partnership**

_____

Mark J. Allen, General partner

_____

Tammy Kerrigan, General Partner

_____

Shannon West, General Partner

**Leathard Limited Partnership**

_____

Paul Leathard, General Partner

**Shelby Trust**

_____

Bill J. Allen, Trustee

_____

**Roger Chan**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

VECO

**VECO CORPORATION**, a Delaware corporation

By: _____
Name: _____
Title: _____

Sellers

**Allen Limited Partnership**

_____
Mark J. Allen, General partner

_____
Tammy Kerrigan, General Partner

_____
Shannon West, General Partner

**Leathard Limited Partnership**

_____
Paul Leathard, General Partner

**Shelby Trust**

_____
Bill J. Allen, Trustee

_____
**Roger Chan**

S-1

dn-137911 v6

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

VECO

**VECO CORPORATION**, a Delaware corporation

By: _____
Name: _____
Title: _____

Sellers

**Allen Limited Partnership**

_____
Mark J. Allen, General Partner

_____
Tammy Kerrigan, General Partner

_____
Shannon West, General Partner

**Leathard Limited Partnership**

_____
Peter Leathard, General Partner

**Shelby Trust**

_____
Bill J. Allen, Trustee

_____
**Roger J. Chan**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

VECO

**VECO CORPORATION**, a Delaware corporation

By: _____
Name: _____
Title: _____

Sellers

**Allen Limited Partnership**

_____
Mark J. Allen, General Partner

_____
Tammy Kerrigan, General Partner

_____
Shannon West, General Partner

**Leathard Limited Partnership**

_____
Peter Leathard, General Partner

**Shelby Trust**

_____
Bill J. Allen, Trustee

_____
**Roger J. Chan**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

VECO

**VECO CORPORATION**, a Delaware corporation

By: _____

Name: _____

Title: _____

Sellers

**Allen Limited Partnership**

_____

Mark J. Allen, General Partner

_____

Tammy Kerrigan, General Partner

_____

Shannon West, General Partner

**Leathard Limited Partnership**

_____

Peter Leathard, General Partner

**Shelby Trust**

_____

Bill J. Allen, Trustee

_____

**Roger J. Chan**

CH2M HILL

**CH2M HILL COMPANIES LTD.**, an Oregon
corporation

By: _____

Samuel H. Iapalucci, Executive VP and
Chief Financial Officer

AEL LLC and MST Ventures Inc., as a third party beneficiary of certain provisions of this Agreement and the Transaction, for themselves and their subsidiary entities, hereby consent to, and agree to be bound by, **Sections 5.4(b)** (*Retained Assets*), **6.5** (*"Commonwealth Construction" Name*) and **12.6** (*Further Assurances*) of this Agreement.

**AEL LLC**, a Washington limited liability company

By: _____

                                        Manager

**MST Ventures Inc.**, a Washington corporation

By: _____
Name: _____
Its: **President**